[Cite as *In re A.L.*, 2023-Ohio-2868.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re A.L., K.L.

Court of Appeals No. L-23-1076
L-23-1077

Trial Court No. JC 22291209
JC 22291483

**DECISION AND JUDGMENT**

Decided: August 16, 2023

* * * * *

Jeremy G. Young, for appellee.

Laurel A. Kendall, for appellant.

* * * * *

**DUHART, J.**

{¶ 1} This is a consolidated appeal from the March 9, 2023 judgment of the Lucas County Court of Common Pleas, Juvenile Division, which terminated the parental rights of appellant, R.L., the mother ("mother") of A.L. ("child 1") and K.L. ("child 2"), and granted permanent custody of the children to appellee, Lucas County Children Services ("LCCS" or "the agency"). For the reasons that follow, we affirm the judgment.

{¶ 2} Mother sets forth two assignments of error:

I. The trial court's finding that mother did not remedy the issue which caused the removal such that the children could not be placed with her within a reasonable time or should not be placed with her pursuant to R.C. 2151.414(E)(1) was not supported by clear and convincing evidence.

II. The trial court's finding that mother demonstrated a lack of commitment to the children by failing to regularly support, visit, or communicate with the children when able to do so pursuant to R.C. 2151.414(E)(4) was not supported by clear and convincing evidence.

**Background**

{¶ 3} Mother and D.D. ("father" or D.D.") have two children together, child 1, born in June 2020, and child 2, born in October 2022. The couple was in a relationship, but not married. Father signed child 1's birth certificate, and father's paternity of child 2 was confirmed by DNA testing.

{¶ 4} The record shows LCCS became involved with the family on August 17, 2020, upon receiving a referral alleging that the parents drink alcohol every day, father held child 1 in one hand and liquor in the other, father uses and sells illegal substances, he is in a gang, and he held a gun to a person's head. A LCCS caseworker went with officers to the parents' home and met with the parents. Mother admitted there was a fight between her, her brother and father, where property was damaged and she had to clean blood off of a door. Father said his gun was registered and locked in a safe. Both parents

2.

denied drug use. LCCS also obtained a Toledo Police Department ("TPD") crime report which listed mother's brother as the victim of aggravated menacing, and father as the suspect, with respect to a fight that happened on August 11, 2020, at the parents' house. Mother started arguing with her brother, and father pulled out a 9mm handgun and pointed it twice at the brother's face saying "I[']m gangster. I'll blow your head off."

{¶ 5} On November 5, 2020, LCCS received a referral alleging that a shooting incident occurred on August 23 or 24, 2020 ("the shooting incident"), in which father called mother to pick him up from a "trap house," where father and his family members sold drugs, and mother arrived with child 1 in the car. Father came to the car and told mother that he had just stolen money, a belt and other items. Gunfire was exchanged between another person and father; the car was hit by bullets including a bullet which went above child 1, who was sitting in his car seat behind the driver's seat.

{¶ 6} LCCS obtained a TPD crime report which set forth that officers responded to an improperly discharging a firearm call, and mother said a short man with a rifle started shooting at her, so father exited the car and began walking backwards. The LCCS caseworker attempted to implement a safety plan by having father or child 1 leave the home; mother said the child had to be placed because father had nowhere else to go. Child 1 was placed with a relative, and the relative agreed to supervise the parents' contact with the child.

{¶ 7} Thereafter, the caseworker went to the relative's home for a weekly visit and met with the relative, child 1, mother and father. Mother became argumentative with the

3.

caseworker, mother and father argued, and mother said father did not shoot his gun, but father then admitted he shot back because it was his right since someone was shooting at him. Mother declared that she wanted child 1 to come home with her on a safety plan, and father would leave the home.[1]

{¶ 8} On November 20, 2020, at a family conference, mother and father said the child was not in the car during the shooting incident, and the relative stated that she had the child when the shooting occurred. Subsequently, an ex parte custody order was issued by the juvenile court, and mother agreed to bring the child to the agency; mother failed to show. A LCCS caseworker and TPD officers went to the relative's home and were informed that the parents took the child and were going to the agency. The officers saw half of a pistol taken apart on the floor of the relative's home. On November 21, 2020, another LCCS caseworker went to the parents' home but no one was home. In December 2020, child 1 was placed in a foster home.

{¶ 9} Mother was provided with a case plan and participated in services. Father did not participate in any case plan services. On July 23, 2021, child 1 was adjudicated dependent. Mother completed all of her case plan services and, in May 2022, child 1 left foster care and was placed with mother, under protective supervision by LCCS. On October 7, 2022, protective supervision of the child was terminated, and the juvenile court ordered no contact between father and child 1.

---

[1] Although the record is not completely clear, it appears that mother and/or father took child 1 from the relative's home, without LCCS's permission.

4.

**{¶ 10}** On October 8, 2022, mother and child 1 went to the wedding of father's relative ("the wedding"). A video of the wedding was provided to LCCS, which showed mother and the child sitting with father. At a staffing held by LCCS several days later, mother admitted she attended the wedding but said she did not know that father would be there. The agency also learned that mother was pregnant.

**{¶ 11}** On October 11, 2022, the juvenile court granted LCCS's ex parte order for shelter care custody of child 1, and on October 12, 2022, LCCS was awarded interim temporary custody. Child 1 was placed in his original foster home. Also on October 12, 2022, LCCS filed a Complaint in Dependency and Neglect: Permanent Custody and Motion for Shelter Care Hearing concerning child 1.

**{¶ 12}** On October 31, 2022, LCCS received a referral that child 2 was born, and on November 2, 2022, the juvenile court granted LCCS's ex parte order for shelter care custody of child 2. That same day, LCCS filed a Complaint in Dependency: Permanent Custody and Motion for Shelter Care Hearing concerning child 2, a shelter care hearing was held and LCCS was awarded interim temporary custody. Child 2 was placed in a foster home, but not in the same home as child 1. LCCS could not place the siblings together because mother had hidden her pregnancy from the agency, and another infant was placed in child 1's foster home between May and October 2022, so that home did not have room for child 2.

{¶ 13} On January 22, 2023, father was arrested and charged with aggravated robbery and assault, both felonies, with firearm specifications, for robbing a food delivery man and firing shots at the fleeing man's vehicle, striking the vehicle.

{¶ 14} On January 27, 2023, LCCS filed an Amended Complaint in Dependency and Neglect, Permanent Custody and Notice of Hearing, with respect to both children.

{¶ 15} On February 13, 2023, the guardian ad litem ("GAL") filed her report and recommendations.

{¶ 16} On February 14, 2023, the dependency hearing and adjudication/disposition hearing ("permanency hearing") for both children was held. On March 9, 2023, the juvenile court issued its judgment entry finding the children dependent, and awarding permanent custody of the children to LCCS. Mother appealed. Father did not appeal and is not a party to this appeal.

<b>The Permanency Hearing</b>

**Caseworker Shawn Bates**

<i>Direct Examination</i>

{¶ 17} Ms. Bates testified to the following. She is an ongoing caseworker for LCCS, assigned to child 1 and child 2 for the entirety of the cases, save for about three months. She recounted the family's history with LCCS, including the original referral alleging that mother, child 1 and father were in a car when gunfire was exchanged and a bullet went above the seat where the child was sitting. There were also concerns that

6.

drugs were sold out of the house where mother and child 1 lived, and father was seen in pictures holding guns and child 1. In July 2021, child 1 was found to be dependent.

{¶ 18} The agency created a case plan for mother, which services consisted of a mental health referral so mother could learn about heathy relationships and trauma, and parenting classes. Mother completed her services.

{¶ 19} Bates understood, from mother, that mother and father were not together from October 2020 through May 2022, so in May 2022, custody of child 1 was returned to mother, with LCCS's protective supervision. That supervision ended on October 7, 2022.

{¶ 20} On October 9, 2022, LCCS received a referral alleging child 1 and mother were with father at the wedding, which violated the no-contact order between child 1 and father. Bates was concerned as father never made himself available to LCCS for case plan services, so she was not able to access if it was safe for child 1 to be around father.

{¶ 21} When Bates spoke with mother, mother said she did not know father would be at the wedding and she sat with father because there were no other seats available. Mother also said father came over to talk with her about the no-contact order, and she was trying to get away from him but she could not leave as she did not drive to the wedding. Bates observed that the 18-minute video showed empty seats at the wedding and did not show mother trying to get away from father.

{¶ 22} As a result of the violation of the court order and mother's failure to protect child 1 due to the continued association with father, LCCS was granted interim temporary

7.

custody of the child. At the shelter care hearing, LCCS was informed by a relative that mother was pregnant with child 2. Mother confirmed her pregnancy and shared she was due in two to three weeks. Eventually, mother admitted D.D. was child 2's father.

{¶ 23} On October 30, 2022, child 2 was born. LCCS filed a complaint to remove child 2, a shelter care hearing was held and LCCS was granted interim temporary custody. Bates remarked that father has never met child 2, despite Bates' great efforts to put father on the visiting list and arrange visits. Bates noted voluntary services were offered to father, but he did not participate in them.

{¶ 24} Caseworker Bates learned that in January 2023, while father was under the influence of substances, he allegedly robbed a food delivery driver and discharged a firearm into the rear of the driver's vehicle. Father was charged with felony offenses.

{¶ 25} At the time of the permanency hearing, mother had been offered voluntary supportive services and trauma services, not case plan services, because the goal was not reunification; mother did not show for the services.

{¶ 26} Child 1 is bonded with mother and there were no concerns about mother at visits. When child 1 was at mother's home, he was a little quiet and reserved, and watched tv a lot when Bates was visiting or he would go in his room to play with his toys.

{¶ 27} Child 1 is doing very well in his foster home, he is developmentally on track with no concerns, he is very talkative, energetic and self-sufficient, and he plays with the other children in the home. Child 1 is very bonded with his foster mom. Bates opined child 1 did a lot more in his foster home than at mother's house.

8.

**{¶ 28}** During mother's visits with child 2, she holds him, feeds him, cuddles with him and bonds with him. There were no concerns about mother at the visits.

**{¶ 29}** Child 2 appears to bonded with his caregiver, he follows her voice with his eyes, and he has just started reaching for her. Child 2 is only a few months old. He seemed happy and well cared for.

**{¶ 30}** The children's foster parents are willing, if they are able to adopt the children, to exchange phone numbers and make sure the siblings visit with each other regularly.

**{¶ 31}** Bates believes it is in child 1 and child 2's best interests for permanent custody to be awarded to LCCS, as mother was offered case plan services to protect the children from being exposed to abuse and neglect, but mother has not applied what she learned, and she continues to put the children at risk.

*Cross-Examination*

**{¶ 32}** Caseworker Bates testified that mother did well and cooperated in her case plan services. Thereafter, lengthy visits between mother and child 1 began two to three months before reunification. Bates had no concerns, as mother's house was neat and clean, mother and child 1 were well bonded, mother was able to take care of child 1's needs and mother was cooperative with child 1's foster caregivers. Bates' concerns were with mother's failure to show behavioral change, as after case plan services were offered and completed, mother continued to have contact with father and was not truthful.

9.

**{¶ 33}** With respect to the wedding video, Bates did not observe any inappropriate behavior; her problem was with the violation of the no-contact order.

**{¶ 34}** There were no substance abuse concerns with mother, and neither child was born positive for substances. Bates conceded the issue was with father, and he was in jail.

**{¶ 35}** When cross-examined by the GAL, Bates noted that she worked with mother from November 2020 until October 7, 2022, and during the 2020 case, mother claimed she was not with father, she was not seeing him, and she did not know anything about him. Bates agreed that, at the time of reunification with protective supervision, a no-contact order was issued between father and child 1.

**{¶ 36}** At the hearing to terminate LCCS's protective supervision of child 1, Bates conceded that mother alluded to the fact that she had no contact with father and she was not going to see him; mother never revealed that she was pregnant. Bates acknowledged that the magistrate made it very clear to mother from the bench that child 1 was to have no contact with father, and the court again ordered no contact between father and child 1. Days later, after the wedding video was provided to LCCS, a staffing was held where a relative disclosed that mother was pregnant and due in a couple of weeks. Mother did not say who the father was, and it was learned when parentage of child 2 was established, that D.D. was the father.

10.

**{¶ 37}** Bates agreed that mother had a bizarre explanation for why she was at the wedding, and mother had been less than honest with LCCS. Bates opined that father appears to be a priority in mother's life, not the children.

**{¶ 38}** Bates noted that child 1's foster family is willing to adopt him, and child 2's foster family is willing to adopt him, and both children need stability and a permanent home.

**{¶ 39}** Bates believed if mother were given additional time and services, reunification with the children would not be possible because mother would be repeating the same case plan services she was offered in the past.

*Redirect Examination*

**{¶ 40}** Caseworker Bates observed that mother successfully completed the parenting and healthy relationship classes, but did not apply the skills she learned to protect the children from people who have a negative effect on them. Bates noted that the wedding, attended by child 1, mother and father, was held in Toledo, Ohio, during the COVID pandemic.

**{¶ 41}** Bates opined that neither child 1 nor mother was safe with father, in light of the pictures of father holding guns on numerous occasions, and father's past and recent criminal charges.

11.

**Mother**

*Cross-Examination*

{¶ 42} Mother testified to the following. She started working, full-time, at a moving company the day before the permanency hearing, and prior to that, she last worked in May 2022, for a few months. She admitted father calls her collect from jail, and she talked to him the week prior to the permanency hearing. She believed she talked to father once a week, and when asked if she talked to him once a day, she guessed so. Recently she started seeing a private counselor, but did not disclose this to the caseworker or GAL.

{¶ 43} When mother lived at her apartment in 2020, father did not live with her, but he stayed there. She acknowledged that she made mistakes in choosing the wrong men, and she is taking steps to remove father from her life. She admitted, when she was cross-examined by the GAL, that she never ended her relationship with father, but she did not tell the caseworker or GAL that the relationship continued throughout the case. Later, mother said it was not necessarily a relationship with father, it was a form of relationship where she saw father every week and had a physical relationship with him. Mother knew she was pregnant with child 2 when she was reunified with child 1, in May 2022, and that D.D. was the father, but she lied about her relationship with father and being pregnant because she did not want LCCS to take her kids, and she was scared.

{¶ 44} When questioned if father is an unsafe person, mother replied, "I mean I think his record speaks for itself." She said, with respect to the shooting incident, she did

12.

not know if father had a gun or fired a gun, and she claimed child 1 was not in the car when the bullet went over where his car seat would have been.

{¶ 45} She acknowledged that father never participated in any services with the agency. As to the wedding, she was told and promised that father would not be there.

{¶ 46} Mother is continuing to have contact with father because she feels like everything has been taken away from her, but she decided "this last night that I don't want to have further contact with [father] and he's in jail, so you guys would know if I did."

{¶ 47} Mother acknowledged that child 1 has been in foster care for about two years, but not consecutively, and child 2 has been in foster care his whole life.

*Redirect Examination*

{¶ 48} Mother was raised in Toledo, but went to Maumee schools until she was home schooled; she received a GED. She met father in mid-2019, through social media, a relationship developed, and she became pregnant with child 1. After LCCS became involved, she was aware she was not to have contact with father, but she wanted her kid to be raised in a two-parent household, and she wanted her kid to have a father, as family is very important to her. She acknowledged she violated the court's order.

{¶ 49} Mother stayed in contact with father, during his incarceration, because she cares about him and she was told by his family that he has been suicidal. She assured the court she will not speak with father again, and she admitted she was dishonest in the past.

13.

She wants another chance with the children, as she knows she screwed up, but she learned her lesson and going forward she will always put the children first.

{¶ 50} Mother's counselor indicated mother may have oppositional defiant disorder.

*Recross Examination*

{¶ 51} Mother conceded she was not exposed to guns while growing up. Regarding the August 2020 confrontation between mother's brother and father while the brother was moving out of mother's apartment, mother insisted father never pulled a gun on her brother, despite what the police report said. She recognized the police report said father got in brother's face, pulled out a 9-millimeter handgun (twice), said he was a gangster and he would blow brother's head off. She also acknowledged the police report said father threw brother's tv out of the apartment, causing it to break. She saw pictures of father with guns on Facebook.

*Further Redirect Examination*

{¶ 52} Mother said the police report was not accurate. She agreed father is no longer viable in her life and he did things which were not beneficial to the children.

**GAL Ann Baronas**

*Direct Examination*

{¶ 53} Ms. Baronas testified to the following. She is an attorney and was the GAL appointed to represent child 1, then child 2. She had contact with mother and met the children. The GAL undertook an independent investigation to determine the children's

14.

best interests. She reviewed the court file, Toledo Municipal Court records, police reports and daycare records, and she noted she was familiar with the shooting incident.

{¶ 54} The GAL visited the children's foster homes and noted they were doing very well in their placements. The children were too young to express their wishes. Child 1's relationship with his foster parent is very good, as they are bonded like a mother and son.

{¶ 55} The GAL was aware that mother completed all of her case plan services and father did not participate.

{¶ 56} Concerning the wedding, mother's story was she was invited to the wedding, and did not expect to see father there, although it was his family. More recently, mother said father wanted to talk about the no-contact order, but this did not make sense because the GAL was not sure father even knew about the order, since father was not in court the previous day, unless mother told him. The GAL also was unsure if father ever knew about the May 2022 no-contact order. The GAL recalled mother was very iffy about who drove to the wedding, what that person's last name was, and who the bride was. The GAL noted buses were free at that time, mother could walk, call an Uber or call a friend to pick her. The GAL remarked that none of it made sense, in view of the pictures, the video and the statements made to mother in court the day before.

{¶ 57} Mother managed to hide her pregnancy from the caseworker and GAL since reunification. The GAL and caseworker suspected mother was still having contact

with father, but could not prove it. It was a complete shock to learn mother was pregnant, and two weeks away from delivery.

{¶ 58} The GAL heard mother's testimony, which included the ongoing contact with father in jail, and thought it was very tragic for the children. She also thought the biggest tragedy is that mother did not tell the truth, and does not really show any remorse for it.

{¶ 59} The GAL wrote a report, and she recommended that permanent custody of the children be awarded to LCCS for adoption planning and placement, as it is in the best interest of the children because they need a legally secure permanent placement. The GAL recognized mother is happy to do all of the services in the world, but in reality, mother is going to do what she wants until it cannot be hidden anymore, or she gets busted. The GAL was very skeptical about mother's epiphany the night before the permanency hearing, because mother had been busted. The GAL noted the children are little and need to be someone's priority, but mother's priority is father.

{¶ 60} The GAL shared that the children's foster parents are willing and excited to connect with one another and make sure the children have a relationship in the future.

*Cross-Examination*

{¶ 61} The GAL believed mother loved the children yet chose father over them. The GAL observed that mother admitted she does not select the healthiest men to have in her life. The GAL noted that with father, mother's inability to get away from him and surrender her relationship with him in favor of the children is a problem for mother. The

16.

GAL accepted that the concern was never with mother's day-to-day parenting, the concerns were with the big things: the firearms, weapons and shootings.

**Permanent Custody Law**

{¶ 62} In a permanent custody case, the juvenile court's decision will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re A.H.*, 6th Dist. Lucas No. L-11-1057, 2011-Ohio-4857, ¶ 11, citing *In re Andy-Jones*, 10th Dist. Franklin Nos. 03AP-1167 and 03AP-1231, 2004-Ohio-3312, ¶ 28. "Every reasonable presumption must be made in favor of the judgment and the findings of facts [of the juvenile court]." *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19, 526 N.E.2d 1350 (1988). "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Thus, a judgment which is supported by some competent, credible evidence going to all essential elements of the case is not against the manifest weight of the evidence. *Karches* at 19; *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus.

{¶ 63} Pursuant to R.C. 2151.414(B), a juvenile court may grant permanent custody of a child to a children services agency if the court determines, by clear and convincing evidence: (1) the existence of at least one of the four factors set forth in R.C. 2151.414(B)(1)(a) through (d), and (2) the child's best interest is served by granting

17.

permanent custody to the agency, if any one of the factors in R.C. 2151.414(E) is present, which would indicate that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *In re M.B.*, 10th Dist. Franklin No. 04AP755, 2005-Ohio-986, ¶ 6; R.C. 2151.353(A)(4); *In re B.K.*, 6th Dist. Lucas No. L-10-1053, 2010-Ohio-3329, ¶ 42-43.

{¶ 64} Relevant here, R.C. 2151.414(B)(1)(a) provides that "the child cannot be placed with either parent within a reasonable period of time or should not be placed with either parent." And, R.C. 2151.414(E) requires a trial court to find that a child cannot be placed with either parent within a reasonable time or should not be placed with either parent if any one of sixteen factors are met. R.C. 2151.414(E)(1) - (16).

{¶ 65} R.C. 2151.414(E)(1) and (4) state, in relevant part:

(E) In determining at a hearing * * * whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the

child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

* * *

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child[.]

{¶ 66} Clear and convincing evidence requires proof which "produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

### Juvenile Court's Decision

{¶ 67} In its March 9, 2023 judgment entry, the court detailed the relevant testimony from the permanency hearing and the evidence upon which it relied in reaching its findings of fact and conclusions. The court found, by clear and convincing evidence,

19.

that the children were dependent, under R.C. 2151.04, as the children lack adequate parental care and the children's environment is such as to warrant the state, in the interests of the children, to assume guardianship.

{¶ 68} The court further found, by clear and convincing evidence, that the children cannot be placed with either parent within a reasonable time or should not be placed with either parent, under R.C. 2151.414(B)(1)(a), (E)(1) and (4), and it is in the best interests of the children to grant permanent custody to LCCS, pursuant to R.C. 2151.414(D)(1), and it would be contrary to the children's best interests to be reunified with the parents.

{¶ 69} As to mother, the court found, under R.C. 2151.414(E)(1), that notwithstanding reasonable case planning and diligent efforts by LCCS to assist mother to remedy the problems that initially caused the children to be placed outside of the home, mother has failed continuously and repeatedly to substantially remedy the conditions causing the children to be placed outside of the home. The court noted mother failed to prove that she can utilize the services and resources made available to her to change her conduct in order to allow her to resume and maintain parental duties, and mother did not internalize the concepts taught in her counseling and parenting classes in order to keep herself and the children safe. The court observed that while LCCS, the GAL and the court worked with the family for over a year, mother was not honest about her ongoing relationship with father, as she concealed the relationship and her pregnancy. The court also found mother's testimony was not credible, including when she claimed

20.

that she had an epiphany and now understands she must stay away from father. The court concluded mother's poor judgment put the children at grave risk.

{¶ 70} The court further found, under R.C. 2151.414(E)(4), that mother has demonstrated a lack of commitment toward the children by choosing a dysfunctional and an unsafe relationship with father, and failing to change her behaviors. The court concluded the children deserve to live in a safe home, where parents prioritize the children's needs over their own wishes and desires, and where the children are not exposed to weapons, gunfire or violent behavior.

{¶ 71} As to the children's best interests, the court found, under R.C. 2151.414(D)(1), a grant of permanent custody to LCCS was necessary. The court observed the caseworker and GAL testified that the children are doing well in their foster homes, all of their needs are being met, and the foster parents are interested in adopting the children should they become available. The GAL opined that an award of permanent custody to LCCS to be in the children's best interests.

{¶ 72} The court further found mother cannot provide a legally secure permanent placement for the children due to her lack of insight and her continued contact with father. The court concluded a legally secure permanent placement for the children cannot be achieved without a grant of permanent custody to LCCS.

**First Assignment of Error**

{¶ 73} Mother sets forth that the juvenile court's finding that she "did not remedy the issue which caused the removal such that the children could not be placed with her

within a reasonable time or should not be placed with her pursuant to R.C. 2151.414(E)(1) was not supported by clear and convincing evidence."

{¶ 74} Mother presents three issues: (1) "whether mother actually failed to remedy the concerns which caused the second removal when LCCS did not enter a certified copy of a court order prohibiting father from having contact with the child onto the record of the case at either adjudication or disposition (same day)," (2) "[w]as the court's decision supported by clear and convincing evidence as to Case #1 [the August 2020 shooting incident]," and (3) "[w]as father realistically a continuing presence in the lives of the children after his arrest for multiple felonies?" (Emphasis sic.)

**First Issue: No-contact Order**

*Mother's Arguments*

{¶ 75} Mother contends that neither of the factors cited by the juvenile court, R.C. 2151.414(E)(1) and (4), were proven by clear and convincing evidence by LCCS, "when no evidence of a 'no contact' order was entered onto the record of the case." She submits that she lost custody of child 1 "the first time, according to testimony at [the permanency hearing], by choosing father over the children, essentially, due to father's propensity to possess and handle firearms." Mother submits it is undisputed that child 1 was removed from her home for the second time immediately after she and child 1 attended the wedding in which "father unexpectedly attended as well." Mother notes "[t]he wedding occurred the day after [she] had been reunified with the child" and the next day, LCCS received a video of the family sitting together at the wedding, and "LCCS reacted

22.

immediately to remove the child from mother's custody (three days after reunification) based on allegations that mother violated a court order of no contact between [child 1] and his father by allowing father to sit together with she and the child."

*LCCS's Arguments*

{¶ 76} LCCS counters the no-contact order was properly admitted into evidence by the GAL during the February 14, 2023 permanent custody hearing. LCCS submits the GAL "had the no contact order admitted into evidence without any objection from Mother's counsel." Then, "[d]uring Mother's testimony, [the GAL] approached Mother, had her identify the October 7th no contact order, and identify the section prohibiting Father from having contact with the child. * * * There was no objection made to the form of the exhibit, authenticity, or its admissibility. The trial court admitted the October 7, 2022, no contact order into evidence, without objection, as Guardian's Exhibit A."

{¶ 77} LCCS further contends that the juvenile court's "own judgment entry with the no-contact order was entered into evidence, without objection. * * * [I]f trial counsel would have objected that the document was not 'certified[,]' certification is only a requirement for self-authentication." LCCS notes the no-contact order was authenticated by mother, "who, as a party to the underlying case that produced the journal entry, could authenticate the document as one that she received." LCCS cites to numerous legal authorities in support of its contentions.

{¶ 78} LCCS also asserts mother "places too much worth on the no-contact order itself. The existence of a no-contact order was not the basis for permanent custody [as] *

23.

* * the no contact order captured the underlying concerns that LCCS, the GAL, and the trial court had regarding the father of the children; those concerns were known to [mother]; and [she] chose to disregard the concerns."

**Analysis - First Issue**

{¶ 79} Upon review of mother's brief, we note that she cited to no legal authority in support of her argument that R.C. 2151.414(E)(1) and (4) were not proven by clear and convincing evidence by LCCS, when "no evidence of a 'no contact' order was entered onto the record of the case," as LCCS did not offer a certified copy of the order to be admitted into evidence.[2]

**Admission of Evidence at a Dispositional Hearing**

{¶ 80} R.C. 2151.35(B)(2) provides, in relevant part:

The dispositional hearing shall be conducted in accordance with all of the following:

* * *

(b) The court may admit any evidence that is material and relevant, including, but not limited to, hearsay, opinion, and documentary evidence * *.

---

[2] While mother referred to "*In re J.H.* 2022 Ohio 4213 (Ohio App. Nov. 23, 2022)," that case makes no mention of a no-contact order, a certified order or the failure to introduce an order into evidence, and it is not relevant to mother's first issue.

{¶ 81} We observe this statute makes no mention that documents must be certified in order to be admitted into evidence.

{¶ 82} In the case of *In re E.A.*, 9th Dist. Medina No. 12CA0059-M, 2012-Ohio-5925, the court did not rely on R.C. 2151.35 when it determined uncertified documents were admissible. Rather, the court found the uncertified documents had been admitted via other evidence. *Id.* at ¶13. The mother had assigned as error that the juvenile court incorrectly admitted hospital records and uncertified children service agency documents, from dependency cases involving the mother's older children. *Id.* at ¶11. The mother argued the records were inadmissible hearsay and could not be admitted as business records, under Evid.R. Rule 803(6), because Job and Family Services ("JFS") failed to properly authenticate them. *Id.*

{¶ 83} The appellate court noted that "[a]lthough the mother did raise objections to the admission of the uncertified hospital records and case plan documents,[3] [JFS] had already questioned its witnesses extensively about the content of those documents, without any objection from the mother." *Id.* at ¶13. The court also observed that "during her cross-examination of some of the agency's witnesses, the mother elicited additional testimony about the hearsay content of those case plans and hospital records." *Id.* The court held that "[t]he admission of the documents themselves, even if erroneous, does not

---

[3] Unlike the mother in *In re E.A.*, mother in the case before us did not object to the admission of the uncertified no-contact order.

25.

constitute grounds for reversal because the substance of the documents had already been admitted through other evidence." *Id.*

**{¶ 84}** Here, we find, based on the legal authority above, that LCCS was not required to enter a certified copy of the non-contact order in the record of the case.

**Mother's Further Arguments as to Evidence Supporting the Juvenile Court's Findings**

**{¶ 85}** Mother disputes that clear and convincing evidence supports the juvenile court's findings, as she claims that the termination of her parental rights was premised on "an alleged violation of a no contact order which was not presented in court." The record belies this argument.

**{¶ 86}** During mother's testimony, the GAL questioned her regarding her contact with father, and mother admitted to her continued contact. Mother also acknowledged she learned how to keep her child safe in parenting classes, and that father is an unsafe person. Furthermore, mother conceded, at the permanent custody hearing, that the juvenile court entered a no-contact order in May 2022, when she was reunified with child 1 under protective supervision, and again on October 7, 2022, when the court terminated protective supervision. Mother also testified regarding her understanding of the no-contact order, and her knowledge that father was to have no contact with child 1. The juvenile court admitted the order as part of the GAL's exhibit A, without objection.

**{¶ 87}** We find the juvenile court properly considered the no-contact order that was introduced through mother's testimony and admitted as evidence without objection.

26.

**Conclusion - First Issue**

{¶ 88} We conclude that mother's argument that R.C. 2151.414(E)(1) and (4) were not proven by clear and convincing evidence by LCCS, as no evidence of an "alleged" no-contact order was entered in the record of the case, is without merit.

**Second Issue: Court's Decision Concerning the Shooting Incident**

{¶ 89} We note that the arguments in the second and third issues of the first assignment of error, and the second assignment of error are interrelated. Therefore, we will examine the arguments together, and reach a conclusion as to all of these arguments.

{¶ 90} Mother asserts that although the motion for permanent custody was filed after the wedding, the questions posed to her and the caseworker at the permanency hearing included the August 2020 shooting incident, which precipitated the original removal of child 1. Mother queries whether "the facts of that incident were actually proven by clear and convincing evidence, notwithstanding the court's finding of fact that the child had been present, when the police report does not mirror the allegations in the referral, and when mother admitted the incident, but denied the child was present." Mother submits LCCS received a referral from someone who claimed that the child was in the car during the shooting incident, and asked that child 1 be removed from the home, but the police report does not list the child as being present in the car during the incident.

{¶ 91} Mother maintains "[t]his court should find that the presence of the child in the car during that incident was not proven by the manifest weight of the evidence. In that case, this court should also find that the agency did not prove that mother didn't

27.

remedy the situation which caused the first removal either, such that the court's finding that the children could not nor should not be placed with mother within a reasonable time was not supported by clear and convincing evidence."

{¶ 92} LCCS's arguments, as to the second issue of the first assignment of error, are set forth under the second assignment of error.

**Third Issue: Was Father a Presence in the Children's Lives After His Arrest?**

{¶ 93} Mother notes that father did not participate in case plan services, and was indicted on two felonies, with firearm specifications, shortly before the permanency hearing. If father is convicted, he would be facing a long time in prison. Mother contends for all practical purposes, father had removed himself from the children's lives, and from contact with mother due the offenses for which he was indicted, and father is no longer a threat to the children's safety. Mother argues that "[t]aken together, this court should find that [LCCS] did not prove by clear and convincing evidence that mother did not remedy the issue that caused the children herein to be removed."

{¶ 94} LCCS's arguments, as to the third issue of the first assignment of error, are set forth under the second assignment of error.

**Second Assignment of Error**

*Mother's Arguments*

{¶ 95} Mother contends the juvenile court's finding, that she demonstrated a lack of commitment to the children, pursuant to R.C. 2151.414(E)(4), was not supported by clear and convincing evidence.

28.

{¶ 96} Mother queries: did she demonstrate a lack of commitment to the child by taking him to the wedding, which she did not expect father to attend, when she had been reunified with the child the day before? Mother maintains "[t]his court should find that she did not fail in that respect." She cites to *In re J.H.*, 8th Dist. Cuyahoga No. 111669, 2022-Ohio-4213, and claims the facts in that case are distinguishable from the facts in her case.

{¶ 97} Mother asserts since she had been reunified with child 1 the day before the wedding, there was no time between the reunification and the second complaint/shelter care for her to demonstrate a lack of commitment by failing to regularly support, visit or communicate with the child when able to do so, or by other action showing an unwillingness to provide an adequate permanent home for the child.

{¶ 98} Mother mentions she was described by the caseworker as bonded to child 1, even though he only lived in mother's custody for a few months of his life. Mother also submits while child 2 was removed at birth and never lived with her, there were still no issues with her handling of him at visits.

{¶ 99} Mother insists the juvenile court's finding that she failed to demonstrate commitment toward the children by failing to regularly support, visit or communicate with the them, pursuant to R.C. 2151.414(E)(4), was simply not supported by clear and convincing evidence.

29.

*LCCS's Arguments*

**{¶ 100}** LCCS notes that mother does not challenge the court's dependency finding or the best interest findings under R.C. 2151.414(E), but she does take issue with the finding under the first prong of the permanent custody test, that the children cannot be or should not be placed with her within a reasonable time, pursuant to R.C 2151.414(E).

*LCCS's Arguments - Second Issue (Shooting Incident)*

*and Third Issue (Father's Contact with Children After His Arrest)*

**{¶ 101}** LCCS notes that mother argued that the first referral, which alleged child 1 was in the car during the shooting incident, was false as the child was not present. LCCS claims the shooting incident is not the central focus now, and whether the child was in the car is immaterial, as the fact remains that father was in a gunfight with mother present. LCCS surmises mother is oblivious to that fact, as she failed to take steps to prevent herself from being in similarly dangerous situations after the shooting incident. LCCS remarks if mother had been injured or killed in the shooting incident, child 1 would be in a devastating position, and mother's failure to comprehend the consequences exhibits a failure to remedy the issues which caused child 1's removal and shows a lack of commitment to the safety and wellbeing of the children. LCCS maintains it presented more than sufficient clear and convincing evidence to the juvenile court to satisfy the findings under R.C. 2151.414(E)(1).

**{¶ 102}** LCCS observes that that mother argues if father is convicted, he faces a long time in prison, so he has effectively removed himself from the children's lives and

30.

from contact with her, so he is no longer a threat to the children's safety. LCCS disputes this, and counters that if father is not convicted of the felonies, mother has not shown any indication of her ability to keep him out of her life or the lives of the children. LCCS asserts that fault in this case rests not only with father's criminal behavior and the risk he poses to the children, but also with mother's decision-making and her unwillingness or inability to make appropriate decisions to protect the safety, stability, and permanency of the children.

*LCCS's Arguments - Second Assignment of Error*

{¶ 103} LCCS asserts it presented more than sufficient clear and convincing evidence to the juvenile court to satisfy the findings under R.C. 2151.414(E)(4), as the evidence showed, despite mother's charade at complying with case plan services, she derived no substantive benefit from the services. LCCS submits the purpose of the case planning was to educate mother on the grave danger father posed to her and child 1, and LCCS was clear with mother that severing ties with father was critical to reunification.

{¶ 104} LCCS contends mother was warned that because father failed to participate in case planning, it was even more crucial that she protect child 1 from father's dangerous and violent behavior, yet she flaunted the court order hours after she was reunified with child 1. This shows a complete disregard for court order compliance and disinterest in learning from services, so additional time working services would be valueless. LCCS insists mother's continued lies to her caseworkers and counselors throughout the time she worked services, negated any benefit the services might have

31.

offered. LCCS notes mother continued her sexual relationship with father, conceived child 2 by him, and hid the pregnancy and the child's parentage from LCCS, the GAL, and the court.

{¶ 105} LCCS maintains that there is no doubt that the parties violated the no-contact order. LCCS argues that mother was made fully aware of the order, she recalled that the magistrate instructed her specifically about father's contact with child 1, and whether mother knew that father would attend the wedding is immaterial. LCCS also contends it is not only mother's violation of the court order which runs contrary to the best interests of the children, it is also the dangerous behavior and situations. LCCS insists the no-contact order was intended to protect the children, and mother's indifference to the no-contact order shows her failure to change her behavior for the betterment of the children.

### Analysis as to Second and Third Issues and Second Assignment of Error

{¶ 106} Upon review of the juvenile court's judgment, the court found, by clear and convincing evidence, the children cannot be placed with mother within a reasonable period or should not be placed with her, under R.C. 2151.414(B)(1)(a), (E)(1) and (4).

{¶ 107} The court determined mother continuously and repeatedly did not remedy the conditions which caused the children to be removed, as she failed to internalize or use the services, resources and concepts she was taught in counseling and parenting classes to change her conduct so she and the children were safe.

32.

{¶ 108} The court noted mother was not honest with LCCS, the GAL or the court about her relationship with father or her pregnancy. The court found mother's testimony was not credible, and her poor judgment put the children at grave risk.

{¶ 109} The court further found mother demonstrated a lack of commitment toward the children by choosing an unsafe relationship with father, and not changing her behaviors. In addition, the court found the children deserved to live in a safe home where their needs are prioritized.

### Conclusions as to Second and Third Issues and Second Assignment of Error

{¶ 110} We have thoroughly reviewed the entire record, and we conclude, as to the second and third issues of mother's first assignment of error, that there is clear and convincing evidence to support the juvenile court's finding that child 1 and child 2 could not and should not be placed with mother, and that mother continuously and repeatedly failed to remedy the conditions which caused the children's removal from the home.

{¶ 111} We further conclude, as to mother's second assignment of error, that clear and convincing evidence in the record supports the juvenile court's findings that mother exhibited a lack of commitment to the children due to her unwillingness to provide an adequate permanent home for the children.

{¶ 112} The record shows that mother completed all of her services, but she failed to change her behaviors, as she continued her relationship with father, who sells and takes

33.

drugs, has firearms and is violent. The foregoing demonstrates that mother prioritized father over the children and their safety.

{¶ 113} In addition, the record reveals that mother defied court orders and constantly lied to everyone involved in the case; she was only forthright after the truth was disclosed by others. In fact, at the permanency hearing, mother gave two different responses to the same question: why did she talk with father while he was in jail? First, she testified that she was continuing to have contact with father because she felt like everything had been taken away from her. Later, mother testified that she stayed in contact with father because she cares about him and she was told he had been suicidal.

*Best Interest Factors*

{¶ 114} Although mother presented no arguments as to the best interest factors, the record shows that the juvenile court considered the following factors: the interaction and relationships of the children with, inter alia, mother, father and caregivers; the children's wishes, as expressed by the GAL; the children's custodial history; and the children's need for a legally secure permanent placement. The juvenile court then reviewed the evidence in the record as to each factor, including: child 1 has spent most of his life in foster care, due to the actions and inactions of the parents, and is bonded with his caregiver, who ensures all of child 1's needs are met; child 2 has been in foster care his whole life and is happy and bonded with his caregivers; the children's caregivers, if permitted to adopt the children, would facilitate contact between the siblings; the GAL noted the children were of tender years and recommended that it was in the children's

34.

best interests for permanent custody to be awarded to LCCS; reunification of the children with mother cannot occur in a timely manner; and a legally secure permanent placement cannot be achieved without a grant of permanent custody to LCCS.

## Overall Conclusions

{¶ 115} We conclude the juvenile court had before it clear and convincing evidence that granting permanent custody of the children to LCCS was in the children's best interests.

{¶ 116} We further conclude the juvenile court's judgment, granting permanent custody of the children to LCCS, is supported by competent, credible evidence and is not against the manifest weight of the evidence. Accordingly, we find mother's first and second assignments of error are not well-taken.

{¶ 117} On consideration whereof, the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Mother is ordered to pay the court costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

35.

Thomas J. Osowik, J.

Gene A. Zmuda, J.

Myron C. Duhart, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.